Filed 4/28/15  Marriage of Wulf CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

<table>
<tr><td>In re Marriage of MICHELE A. and<br>GERALD W. WULF.<hr>MICHELE A. WULF,<br><br>    Appellant,<br><br>      v.<br><br>GERALD W. WULF,<br><br>    Respondent.</td><td>G049636<br><br>(Super. Ct. No. 10D000079)<br><br>O P I N I O N</td></tr>
</table>

Appeal from a judgment of the Superior Court of Orange County, Nancy Wieben Stock, Judge.  Reversed and remanded with directions.

Michele A. Wulf, in pro. per., for Appellant.

Ludwig Law Center, Inc., Eric S. Ludwig and Michelle P. Ludwig, for Respondent.

\*        \*        \*

Michele A. Wulf appeals from the judgment dissolving her marriage to Gerald W. Wulf. Because the parties share the same last name, we refer to them by their first names for the sake of clarity. Michele challenges very specific provisions of the judgment, including the trial court's treatment of particular financial items, and a last-minute change to the parties' previously established custody order. We conclude Michele's challenge to the court's alteration of custody has merit. As Gerald expressly concedes, the final judgment altered an aspect of the prior custody order that specified which parent would pick up the minor child, even though the court had clearly stated the trial on reserved issues did not encompass child custody matters. The court's "inherent power" to modify custody orders does not permit it to do so in the absence of proper notice and an opportunity to be heard.

We also agree the court erred by treating the obligation to repay a $50,000 post-separation loan Gerald took from a community account as a community obligation for which Gerald was given repayment credit on the marital balance sheet. As Michele points out, Gerald's repayment of the loan goes back into the same account, which was awarded to Gerald in the dissolution. Consequently, Gerald's repayment is effectively a payment to himself. Further, we note that because Gerald's loan was taken postseparation, the obligation to repay it was Gerald's separate obligation, rather than an obligation of the community. Thus, it should not have been included on the marital balance sheet.

We consequently reverse the judgment, and remand the case to the trial court with directions to: (1) reinstate the provisions of the custody order in effect at the time the court announced its tentative decision following the trial on financial issues, and to incorporate those provisions into the judgment; and (2) recalculate the marital balance sheet, and the equalizing payment Gerald owes to Michele, without giving Gerald credit for his repayment of the $50,000 loan.

2

FACTS

Michele and Gerald were married in March 1996, and were granted a status-only divorce in December 2011. They have one child, born in 1999. Child custody orders were entered in September 2011 – apparently by stipulation, although the record is not entirely clear on this point. The parties were unable to resolve their disputes over financial matters; however, and the case proceeded to trial on those issues in October 2012.

In January 2013, the court held a hearing to announce its oral tentative ruling on the financial disputes addressed in the trial. The court stated that "*this trial on reserved issues did not involve child custody matters*. And in that regard I have to . . . share with the parties that that is a good thing. It's difficult enough to try cases on property and financial matters, but trying them on child custody matters can be extremely difficult. So obviously, the parties exercised your leadership and your parenting instincts to arrive at your understandings before you came here on those issues." (Italics added.)

The court then proceeded to give its oral statement of decision on the financial issues, explaining that if nothing else were said or done, that statement would become the court's formal statement of decision. The court also directed Gerald to submit a proposed judgment and serve it on Michele within 30 days of receiving the reporter's transcript of the hearing. The court instructed Gerald that the proposed judgment he submitted should be a "unified" one, meaning he "should go back and pick up, for example, *the child custody orders that were entered on September 1, 2011, and any other significant orders* that would be judgment-worthy, *that are final in nature* . . . so we have a unified judgment and not just a series of handwritten prior orders." (Italics added.)

Among other things, the court found that both parties had breached their fiduciary duty to the other: Michele had purchased $33,000 worth of jewelry without

3

Gerald's knowledge or consent, and Gerald took a $50,000 postseparation loan from a community account without Michele's consent. The court concluded that both should be sanctioned pursuant to Family Code section 1101.

The court also struggled somewhat with how to properly account for the loan taken by Gerald: "That's the question I had as to how we are accounting for the $50,000 item. It didn't show up as a charge to husband on anybody's balance sheet, at least not in that amount. So I wasn't sure how we were accounting for it." The court then noted that both the debt and the obligation should be on the marital balance sheet: "If he's being charged the 50,000 and he's also picking up the debt for the 50,000, they probably should both be on the marital property balance sheet. . . . [¶] So we should do that, or just take it off the balance sheet." The court then reiterated, "I currently . . . don't have him being charged the 50[,000] because he's picking up the debt without credit." Additionally, the court made it clear that Gerald was entitled to no credit for the $25,000 sanction levied against him in connection with the loan. When his counsel suggested that "if he's taking the loan and he's being charged $25,000 for taking a loan, that means he's being charged $75,000 against that asset," the court stated that the sanction was "a completely separate area of the balance sheet. That's not a property division. That's the imposition of a statutory penalty; completely different concept."

When Gerald's counsel again complained that it was unfair to penalize Gerald on the balance sheet for taking out the loan, and then also require him to pay it back without credit, the court again emphasized that the sanction items were not part of the property division: "I stuck [the penalties] on the marital property balance sheet, just so we could possibly use it for equalization. . . . [¶] . . . We could have that just be a separate item. But I went ahead for the sake of discussion and rolled it in as a part of the equalization so we could get a single dollar figure that would be the final figure for everybody at the table here. [¶] So that's why I've got the double-sided entry. You could draw a line right below Vanguard Accounts Already Divided.' At that point we

4

have left the property balance sheet and everything below that is things like penalties and attorney's fees. But I thought we might want to roll them up and get this all handled in one equalization."

Gerald's loan also decreased the value of the community account – a Pacific Life Teachers Savings Account (TSA) held solely in his name – from which he had taken it. The court calculated the starting account value as $132,000, but the current value as $91,000, after accounting for the loan. The court awarded the $91,000 cash value of that asset to Michele.

After the court set out its tentative findings on the financial issues, it allowed the parties to ask questions and make comments and suggested they take a break to meet and confer about the court's tentative findings. After the break, the parties each made suggestions to clarify certain aspects of the court's findings, and addressed other issues. At the conclusion of the hearing, the court indicated its expectation that the parties would continue to meet and confer about the provisions of the proposed judgment.

The parties were unable to agree on the terms of a proposed final judgment, and the court permitted the parties to file letter briefs and set the matter for a review hearing on December 9, 2013. The court's docket reflects that while Michele filed a brief on December 4, Gerald did not.

The parties appeared in court for the review hearing, but our record includes no transcript of what occurred. The court's minute order reflects it signed and filed the final judgment, which includes an 18-page attachment setting forth terms on the same day as that review hearing. Four and a half pages of that attachment detail the terms of child custody. Six pages of the attachment detail the division of property, creditor's claims and assumptions of obligations. Among other things, this part of the judgment confirms that while Michele is awarded the "specific sum" of $91,000 from the TSA, the account itself was confirmed to Gerald as his sole and separate property. It also

5

states that "the parties have no community debts" and Gerald assumes the debt obligation for the loan he took against his TSA "as his sole and separate property."

The final two pages of the attachment are a "CFLA Propertizer" marital balance sheet, which lists each item of what the court's judgment otherwise identified as marital community property or community debt, and entries for attorney fees awards and sanctions. The CFLA Propertizer balance sheet then details the value attributed to each asset and debt, and shows whether the court assigned it to Michele or Gerald. The initial reconciliation of these assets and debts showed that Gerald, who received the marital residence as an asset, was obligated to make an equalizing payment of $90,105 to Michele. However, the court interlineated by hand two additional items on the balance sheet – a double-sided entry for "[Family Code section] 1101 sanctions against wife in favor of husband," showing a credit to Gerald of $16,500, and a debit to Michele in the same amount. The second interlineated item was an entry giving Gerald a $50,000 credit for paying "Pacific Life TSA community debt," but without any corresponding entry charging him for receiving the TSA loan funds. After those items were incorporated into the balance sheet, Gerald's equalizing payment was reduced to $48,605.

## DISCUSSION

### 1. *Standard of Review*

"A judgment or order of the trial court is presumed to be correct, and all intendments and presumptions are indulged to support it on matters as to which the record is silent. [Citation.] It is the appellant's burden to affirmatively demonstrate error." (*In re Marriage of Gray* (2002) 103 Cal.App.4th 974, 977-978.)

And while Michele did not provide a reporter's transcript of the trial – she provided only a transcript reflecting the court's recitation of its statement of decision – and elected to proceed with this appeal based solely upon a clerk's transcript which

included some trial exhibits, this qualifies as an appeal from the judgment roll. (*Allen v. Toten* (1985) 172 Cal.App.3d 1079, 1082-1083.) "In a judgment roll appeal based on a clerk's transcript, every presumption is in favor of the validity of the judgment and all facts consistent with its validity will be presumed to have existed. The sufficiency of the evidence is not open to review. The trial court's findings of fact and conclusions of law are presumed to be supported by substantial evidence and are binding on the appellate court, unless reversible error appears on the record." (*Bond v. Pulsar Video Productions* (1996) 50 Cal.App.4th 918, 924.)

## 2. *Child Custody*

Michele first argues the court erred by changing the custody order in its judgment, pointing out that such alteration is inconsistent with the court's own clear statement that "this trial on reserved issues did not involve child custody matters," as well as with its direction that Gerald prepare a proposed judgment which incorporated "the child custody orders that were entered on September 1, 2011."

We agree. Although our very limited record in this appeal does not include a copy of the September 2011 custody orders, and thus we cannot compare those orders to the custody provisions in the judgment, Gerald admits the court's judgment "made a change to the custody orders that provided that the receiving parent pick-up the minor child." He defends this alteration of the custody order in the judgment on the basis that the court has "inherent power to modify custody orders," and he implies the issue was one he raised in a letter brief to the court prior to the December 2013 hearing at which the court entered judgment.

However, as we have already noted, while the record reflects the court *permitted* both sides to file letter briefs in connection with the December 2013 hearing, there is no indication in the docket that Gerald actually filed one – let alone any suggestion that his letter might have sought any change in *custody* terms. And even if he

7

had, the court could not alter custody terms based solely upon a request thrown into a party's posttrial brief following a trial that had been explicitly limited to *financial* issues.

The court's exercise of its "inherent power" to modify custody orders, like its exercise of other powers, must be done in accordance with the requirements of due process. "[A] dissolution court cannot grant unrequested relief against a party who appears without affording that party notice and an opportunity to respond. [Citations.] Due process requires affording a litigant a reasonable opportunity, by continuance or otherwise, to respond to evidence or argument that is new, surprising, and relevant." (*In re Marriage of O'Connell* (1992) 8 Cal.App.4th 565, 574.) "Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard. (*In re B.G.* (1974) 11 Cal.3d 679, 688-689.)

In this case, Michele contends the court's alteration of the custody provision specifying who would pick up the parties' child created a significant problem for her, because she suffers from a spinal cord injury that makes it extremely painful and dangerous for her to drive a significant distance in the evenings. She points out that the court made an explicit finding in the judgment that she is "disabled, has been in such a condition for some period of time, and would work if she could." Gerald counters that the court's determination Michele was disabled from *working* did not establish she was in any way disabled from *driving*, and notes there is nothing in the record that states she is. But that simply highlights the due process problem.

Michele's contention is that if she had understood in advance the court was contemplating a last-minute change in the custody order – one which would require her to drive a significant distance in the evening to pick up the parties' child – she would have been able to produce "an affidavit from her doctor about her condition and limitations."

8

But because Michele was deprived of that opportunity, there is no such evidence in the record.

The usual method employed by a party seeking modification of a custody order is to file a formal order to show cause (OSC). And conspicuously missing from the trial court's docket is any indication that Gerald filed such an OSC seeking any modification of the custody order between the end of the trial (when the court declared no child custody issues were involved) and the judgment. In these circumstances, the custody modification inserted into the judgment cannot stand.

*3. The Visa Bill*

Michele complains the "court erred in finding [a] $8,713 Visa bill, as a debt," even though she describes it in her opening brief as a bill that "was due and owed during the marriage." She seems to be arguing the court's error was its failure to acknowledge that Michele had *already paid* this bill from her "personal money" prior to the judgment, and apparently believes the court should have removed the debt from the marital balance sheet and instead forced Gerald "to pay his equal share."

We reject her contention because what Michele fails to understand is that by including the debt on Michele's side of the "CFLA Propertizer" marital balance sheet incorporated into the judgment, the court gave her the very outcome she now seeks; i.e., it forced Gerald to bear his fair share of that previously paid community debt.

The purpose of a marital balance sheet is to ensure that each side ends up with the same net amount of community assets after all community debts are satisfied. When an exact division of the assets is not possible – such as in cases where one party takes sole ownership of the marital home and there are not enough other assets to equal its value – the party who retains the greater amount of assets is required to make an equalizing payment to the other, to achieve the ultimate goal of balance between the values received by each party.

9

As part of achieving that balance, the court must ensure that if either party is assigned responsibility to pay a community debt, that *liability* is also included on the balance sheet and offset by other community assets assigned to the party, so that each party's *net share* of community assets remains equal. In this case, the marital balance sheet incorporated into the judgment shows that for purposes of the judgment, Michele was assigned that community Visa debt, and thus *credited* with having paid it. That meant her share of community assets had to be increased to account for her earlier payment of that community debt. And because the total amount of community assets is a fixed number, the increase on Michele's side required a corresponding decrease on Gerald's. It was through that decrease that Gerald effectively paid his "fair share" of the Visa bill.

Even assuming Michele did pay this Visa bill before the judgment was entered, as she claims, the retention of that community debt on her side of the marital balance sheet was appropriate, as it was the only way the court could ensure she received proper credit for having done so. In short, the Visa debt was assigned to Michele in the judgment, she was given credit for paying it, and she paid it. Whether that payment came before, or after, the judgment is of no moment.

*4. The Jewelry*

Michele next challenges the judgment's treatment of jewelry she purchased at a cost of $33,000, during the marriage. The court found that her purchase of the jewelry, using community funds, was a breach of fiduciary duty, which she does not contest. In its statement of decision, the court acknowledged there was some evidence Michele's intent had been to resell the jewelry as a business, but noted there was no effort by Michele to execute the second half of such a plan; i.e., to sell the jewelry. The court stated it was "inclined to enter on her part of the balance sheet the sum of $33,000, which is as close as we can ascertain in the court's view from the credit card receipts the likely

10

monies paid out of community property funds for the assets. And I would award her those assets." The court also tentatively awarded Gerald $1,800 in attorney fees, tied specifically to Michele's "fiduciary duty issue."

The court's judgment confirmed the finding that Michele had breached her fiduciary duty, and stated she would be charged one-half the cost of the jewelry as a sanction pursuant to Family Code section 1101. Subdivision (g) of that statute provides that "[r]emedies for breach of the fiduciary duty by one spouse . . . shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs."

The court's judgment expressly states that Michele was being charged "one-half (1/2) the community expense of the asset ($33,000)" and that it was "enter[ing] double entries on each side of the balance sheet." And the CFLA Propertizer balance sheet included in the judgment demonstrates that (1) Michele was assigned the jewelry as a community asset valued at its cost, and (2) she was charged $16,500 as "[Family Code] 1101 sanctions" in double entries – one entry showing an asset of $16,500 on her side of the community property balance sheet, and the other showing a debit in the same amount on Gerald's side of the sheet. The combined effect of those two $16,500 entries was that Michele reimbursed the community for the entire $33,000 cost of the jewelry she had purchased in violation of her fiduciary duty.

Michele first argues the court's judgment is inconsistent with its statement of decision, which she believes gave her both the jewelry valued at $33,000 *and its monetary value* after finding she had breached her fiduciary duty in connection with the jewelry's purchase. She believes "there were no sanctions involved" in the statement of decision.

Michele has simply misread the record. The court's statement of decision reflects a finding that Michele breached her fiduciary duty to Gerald through her

11

expenditure of $33,000 in community funds on the jewelry, and thus its reference to "enter[ing] on her part of the balance sheet the sum of $33,000, which is as close as we can ascertain [is] the likely monies paid out of community property funds for the assets," meant the court was holding her *liable to the community* for that entire cost *as a sanction*. The court did not mean it was awarding her the jewelry's monetary value as a benefit. Having effectively required Michele to reimburse the community for the cost of the jewelry, the court's tentative decision also awarded her the jewelry as a community asset, valued at its cost.

The court's judgment is consistent with the tentative ruling. Although Michele is concerned that the judgment's reference to "double entries on each side of the balance sheet" means she was charged $66,000 for the jewelry, she is incorrect. The "double entry" referenced by the court merely reflects that Michele's $16,500 sanction was entered both on her side of the community property balance sheet and on Gerald's side, so that the combined effect of those entries was that she reimbursed the community for the entire $33,000 cost of the jewelry – exactly what the court's tentative decision stated would occur.

And because Michele owned an undivided 50 percent of the community's assets, she also benefitted from that reimbursement to the community in an amount equal to half the total. Consequently, the ultimate effect of the sanction on Michele was the same as if she had paid Gerald half that $33,000 community reimbursement – i.e., $16,500 – out of her separate funds. Thus, the court's treatment of the sanction on the balance sheet was consistent with both its statement of decision and the provisions of the judgment. We find no error.

5. *Accounting for Loan Taken by Gerald from the TSA*

Michele also challenges the court's accounting for the $50,000 loan taken by Gerald against the TSA, which was a community asset. The court found Gerald had

12

also breached his fiduciary duty when he took out a $50,000 loan against the TSA, "without consent or sufficient notice to [Michele.]" Thus, the court again "impose[d] the remedy called for and mandated by Family Code section 1101, which is 50% of the amount ($25,000)." The CFLA Propertizer balance sheet incorporates this $25,000 charge, referring to it explicitly as "[f]iduciary Duty Breach by H re: $50K loan." And just as with Michele's sanction, the court entered Gerald's $25,000 sanction on both sides of the balance sheet, which combined for a total of $50,000, equal to the size of the loan Gerald took in violation of his fiduciary duty.

Michele first complains the court's judgment does not account for the loan *proceeds* as a marital asset to be divided. However, absent of a complete record of the evidence admitted at trial, containing undisputed evidence that the loan proceeds still existed in divisible form at the time the marital assets were divided, we must presume there were no proceeds to divide. (*In re Marriage of Gray, supra*, 103 Cal.App.4th at pp. 977-978.) We consequently find no error in the court's failure to list those loan proceeds as a divisible community asset.

Michele also argues the court erred by giving Gerald $50,000 credit in the marital balance sheet for his obligation to repay the TSA loan. This time, we agree.

Michele's specific point is that the loan was taken from the funds contained in the TSA, a marital asset that was ultimately awarded to Gerald, and she claims the terms of the loan require the funds be repaid back into that same account. Thus, she contends that when Gerald repays the loan, he is actually depositing funds into his own account – and that consequently, the repayment obligation is not actually a net liability for Gerald.

While the court made no explicit finding on that point, we can nonetheless discern from the record that Michele is correct. The judgment itself confirms that Gerald's loan was actually taken "from" the TSA, and the court explained in its statement of decision that Gerald's loan *decreased the balance in that account*. Given that fact, it is

13

beyond dispute that Gerald's obligatory repayment of that same loan would *replenish* the value of that account. There is no third party recipient of the loan payments. And since that account was awarded to Gerald, we agree that Gerald's loan repayment is effectively a payment to himself. He was entitled to no credit on the marital balance sheet for such payments.

Further, we also agree with Michele for a different reason. The court's statement of decision adopts Michele's characterization of the loan, which is that "*after separation*, [Gerald] took $50,000 in loan value as against the Teacher's Savings Account." (Italics added.) An obligation incurred unilaterally by a party following separation does not qualify as a *community* obligation. (Fam. Code, § 910.) More significant, the court's judgment explicitly confirms the separate nature of this obligation, stating first that "the parties *have no community debts*" (italics added), and then that the loan obligation to the TSA is Gerald's "sole and separate property."

Because Gerald took out the loan after separation, it did not create any *community* obligation that had to be accounted for on the marital balance sheet. The $50,000 loan – and the resulting debt – were Gerald's alone. Moreover, even if that were not true, the fact that Gerald's repayment of the loan would directly replenish the value of an account that was awarded to him in the dissolution means the repayment obligation did not reflect a true liability for Gerald. For both of these reasons, we conclude the court erred when it gave Gerald credit for repaying the $50,000 loan to the TSA on the marital balance sheet.

6. *Valuation of the TSA*

Michele also complains that the court erred by valuing the TSA at $91,000, rather than at $132,000, when it awarded her the value of that account in the judgment. She argues "there was substantial evidence" that the account was actually worth $132,000. However, as we have already explained, in the absence of a complete record

14

of the evidence admitted at trial, "[t]he sufficiency of the evidence is not open to review. The trial court's findings of fact and conclusions of law are presumed to be supported by substantial evidence and are binding on the appellate court, unless reversible error appears on the record." (*Bond v. Pulsar Video Productions, supra*, 50 Cal.App.4th at p. 924.)  Consequently, we cannot address this claim.

## DISPOSITION

The judgment is reversed, and we remand the case to the trial court with directions to:  (1) reinstate the provisions of the custody order in effect at the time the court announced its tentative decision following the trial on financial issues; (2) recalculate the marital balance sheet, and the equalizing payment Gerald owes to Michele, without giving Gerald credit for his obligation to repay the $50,000 loan to the TSA; and (3) incorporate those provisions into a new judgment that is otherwise unchanged.  Michele shall recover her costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

15